# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

COPAR PUMICE CO. INC.,

       Plaintiff,

    vs.                               No. CV-06-97 WJ/WPL

DALE BOSWORTH, Chief of the
United States Forest Service; LUCIA M.
TURNER, Appeal Reviewing Officer,
Deputy Regional Forester, United States
Forest Service; GILBERT ZEPEDA,
Forest Supervisor, United States Forest
Service,

       Defendants.

## MEMORANDUM OPINION AND ORDER DISMISSING
## PETITION FOR REVIEW AND REVERSAL OF AGENCY DECISION

THIS MATTER comes before the Court as an appeal from an administrative decision.

Petition for Review and Reversal of Agency Decision, filed February 3, 2006.  Having heard oral

argument on the matter on June 26, 2007, and having considered the parties' briefs and the

applicable law, I find that Plaintiff has not satisfied its burden under the applicable legal standard

and that therefore the Petition will be denied.

Plaintiff Copar operates the El Cajete pumice mine on mining claims located on Forest

Service lands in Sandoval County, New Mexico in the Jemez National Recreation Area.  El Cajete

is an open pit pumice mine and pumice screening plant. Defendants are the U.S. Forest Service

("Forest Service," "agency," or "Government") and representatives of the Forest Service.  The

appeal concerns Defendants' administrative decisions issued on November 21, 2005 and

December 6, 2005, affirming the December 23, 2003 Notice of Noncompliance issued to Plaintiff.

The Notice of Noncompliance notified Copar that it was violating federal regulations because it was not selling all of the pumice extracted from the El Cajete mine to the stonewash laundry industry.  Under the Government's interpretation of the relevant regulations, the only type of pumice Copar is permitted to extract under federal law is the "uncommon variety" of pumice which is defined by its marketability, or end use, to the stonewash laundry industry for use as an abrasive or laundry conditioner (as in stonewashed jeans).

## BACKGROUND

Some information on general mining law is helpful in discussing the background of this case.

## I.      General Mining Law

The Forest Service is authorized to manage surface resources by federal statute, but not to interfere with mining claims.  See, Converse v. Udall, 262 F.Supp. 583, 585 (D.C. Or. 1966) (discussing the Surface Resources Act, 30 U.S.C. § 612).  The General Mining Law of 1872 ("General Mining Law," 30 U.S.C. § 22 et seq.) allows one to locate and stake either of two types of claims – patented and unpatented.  A patented claim is obtained by locating a valuable mineral deposit on the claim and then obtaining a patent certificate from the Government.  An unpatented mining claim is obtained by locating a deposit in a mineral vein or lode on public lands, and staking the boundaries of the claim.  In the latter case, title to the land where the mining claim is located remains with the Government, but the severed minerals and proceeds are the personal property of the miner.

Mineral deposits are generally classified by type as "locatable," "leasable," or "saleable."

2

This case involves the "locatable" variety, which includes the base and precious metal ores and certain classes of industrial minerals.  A mining claim or "location" is staked over the deposit and permits are necessary to begin mining the material.

A.      Pertinent Mining Laws and Regulations

A "valuable mineral deposit" means a deposit of a character such that a person of ordinary prudence would be justified to expend labor and have a reasonable prospect of success in developing a valuable mine.  U.S. v. Coleman, 390 U.S. 599, 602 (U.S. 1968).  There are two tests for determining value – the "prudent man" test (where a person of ordinary prudence would be justified to spend labor and develop a valuable mine), and the "marketability" test (requiring claimed materials to possess value as of the time of their discovery).  See, Verrue v. U.S., 457 F.2d 1202, 1203 (9th Cir. 1972).

Congress passed the Common Varieties Act of 1955, 30 U.S.C. § 601 et seq., which removed deposits of "common varieties" such as sand, stone, gravel and pumice from the application of the General Mining Law, and made these materials subject to sale under the conditions for disposal which are set out in the Act.  The Common Varieties Act clarified the process for the classification and disposition of mineral resources:

> The Secretary. . . may dispose of mineral materials (including but not limited to common varieties of the following: sand, stone, gravel, pumice, pumicite, cinders, and clay) . . . on public lands of the United States,  . . .  if the disposal of such mineral or vegetative materials (1) is not otherwise expressly authorized by law, including. . .  the United States mining laws, and (2) is not expressly prohibited by laws of the United States, and (3) would not be detrimental to the public interest.

30 U.S.C. § 601.  Federal regulations promulgated under the Common Varieties Act, referred to as "Subpart C regulations," (37 CFR § 228) regulate the disposal of *common* variety minerals, or

minerals having little economic value:

> Mineral materials to which this subpart applies. This subpart applies to mineral materials
> which consist of petrified wood and common varieties of sand, gravel, stone, pumice,
> pumicite, cinders, clay, and other similar materials. Such mineral materials include deposits
> which, although they have economic value, are used for agriculture, animal husbandry,
> building, abrasion, construction, landscaping, and similar uses.

36 CFR §228.41(c).

B.   Exclusions from the Common Varieties Act

Minerals are excluded from the Common Varieties Act if the mineral deposit has some

property "giving it distinct and special value":

> "Common varieties" as used in this subchapter and sections 601 and 603 of this title does
> not include deposits of such materials which are valuable because the deposit has some
> property giving it distinct and special value and does not include so-called "block pumice"
> which occurs in nature in pieces having one dimension of two inches or more.

30 U.S.C. § 611.   Federal regulations promulgated under 30 U.S.C. § 611 further clarify the

exclusion categories:

> Minerals not covered by this subpart.  Mineral materials do not include any mineral used in
> manufacturing, industrial processing, or chemical operations for which no other mineral
> can be substituted due to unique properties giving the particular mineral a distinct and
> special value; nor do they include block pumice which in nature occurs in pieces having
> one dimension of two inches or more which is valuable and used for some application that
> requires such dimensions.

36 CFR § 228.41(d).  In addition, § 228.41(e) states that "use"of a mineral could transform a

common variety mineral into an uncommon variety (which is another way of excluding that

mineral from the regulation's disposal requirements): "A use which qualifies a mineral as an

uncommon variety under paragraph (d) overrides classification of that mineral as a common

variety under paragraph (c) of this section."

The disposal of minerals which are excluded under the Common Varieties Act is covered

4

under the provisions of the General Mining Law.  36 CFR § 228.41(d).  The regulations pertaining to mining operations conducted under the General Mining Laws of 1872 are found in Subpart A regulations, as opposed to the Subpart C regulations which address disposal of common variety minerals.  Subpart A regulations include requirements for how mining operations are to be conducted, including the submission and approval of a "plan of operations" for any mining activity. 36 CFR § 228.2 Subpart A.  These regulations also provide for the issuance of a notice of noncompliance if a mining operator is not in compliance with the plan of operation and if the noncompliance is causing injury, damage or loss to surface resources -- much like the Notice of Noncompliance which led to this appeal.

## II.    Factual Background to this Case

A.    <u>Cook's Mining Claims</u>

Copar is a family business owned by Richard Cook and his family.  In the late 1980's, Richard Cook started the development and marketing of twenty-three mining claims, known as the Brown Placer Claims, which were located in the Jemez Mountains in New Mexico.  Four of these claims, 9-12 are the claims which form the El Cajete mine, which are at issue in this appeal. Plaintiff filed patents for locatable pumice on these claims.  While Mr. Cook was waiting for the second half of his two-part patent application to be issued, Congress passed the Jemez National Recreation Area Act ("JNRAA"), 16 U.S.C. § 460jjj(a)(2), which closed that area to mining claims.  This meant that no more patents could be issued after May 30, 1991, and the lands were no longer available for the location of valuable mining claims, or the removal of nonvaluable (or common variety) mineral materials.   Persons who had then-existing mining claims in the Jemez area were told to file a "taking without just compensation" claim for the loss of patent rights (16 U.S.C. § 460 jjj-(a)(2)).

Copar filed a takings claim in Federal Claims Court in order to claim the loss of his patent rights. The Federal Claims case was brought by Mr. Cook and his daughter, Kelly Armstrong. See, Cook v. U.S., 42 Fed.Cl. 788, 792-3 (1999).  Around the same time, the Forest Service conducted a mineral classification determination on Mr. Cook's claims, and subsequently issued a Classification Report which noted that the Brown Placer claims 9-12 contained pumice which "should be disposed of under the authority of 36 CFR § 228 Subpart A regulations for minerals locatable under the general mining laws." AR2.[1]

While Mr. Cook's takings claim was being decided, plans for mining began.  A Plan of Operations, an Environmental Impact Statement ("EIS") (AR 3), and a Monitoring Plan were all required, and approved, by the Forest Service prior to mining.  The EIS allowed Copar to mine 100,000 tons of pumice a year.  It also identified different plans for the "common variety pumice" as opposed to the "locatable pumice."   The common variety would be stockpiled and later used for reclamation of the area, while the locatable pumice would be sent out for processing at Copar's plants in San Ysidro and Espanola.  The Monitoring Plan listed criteria that the Forest Service was to use for the mining that went on at El Cajete, which included verification that the pumice which left the mine was at least 3/4 inch or larger (+3/4"), that the trucks carrying the pumice were covered, and verification of the origination and destination of the pumice haul. Neither the Plan of Operations nor the Monitoring Plan expressly requires that all pumice produced from the mine be used exclusively in the laundry industry.  AR 5, 6.

In 1999, the Federal Claims Court decided in favor of Mr. Cook on the takings claim. The

---

[1]  "AR" refers to the Administrative Record.  The number following "AR" refers to the tabs, subsequently followed by pages within the tabs, where applicable.

court noted that the patent applications stated that over 50% of the mine deposits contained +3/4"

pumice blocks, which confirmed the uniqueness of the pumice in that it was valuable and

marketable.  The court found that this was more than sufficient to claim discovery of a locatable

mineral under the Multiple Use Act.  <u>Cook v. U.S.</u>, 42 Fed.Cl. 788, 792-3 (1999).   The court

concluded that the Government failed to show that Copar did not comply with final patent

requirements, or that the JNRAA had destroyed Mr. Cook's vested property interest in the mining

claims.  On April 4, 2002, following the court's decision, the Cooks and the United States entered

into a Settlement Agreement where the Cooks would retain the Brown Placer claims 9-12 as

unpatented mining claims, and give up the other Brown Placer Mining Claims.  Under the

Agreement, Copar is prohibited from disposing common variety pumice from Claims 9-12.  AR

21. The Agreement also compensated the Copar claimants in the amount of nearly $4 million for

the pumice that was less than 3/4" which they could no longer mine under the JNRAA because

that size pumice was considered common variety.  AR 31 at 1.

B.      <u>Legal and Postural Background of this Case</u>

        This case germinated when the Forest Service issued a Notice of Noncompliance to

Copar, which held that Copar may not remove "locatable," uncommon variety pumice and

subsequently sell it for "common variety" purposes.  AR 58.  The Notice also included a finding

that damage to surface resources was being caused by its removal of pumice in excess of what it

was supposed to be selling to the stonewash laundry industry market.  The Notice required

Plaintiff to modify its Plan of Operations for the mine to restrict the use and disposition of pumice

minerals removed from the site only to the stonewash laundry industry.  The stated incidence of

non-compliance under the Notice was Copar's failure to provide verifiable proof of the end use of

the pumice removed from the El Cajete Mine.

An affidavit from Richard Bell, manager of operations at El Cajete, states that no common variety pumice is being removed from the mine site, and that all common variety pumice is being used for reclamation purposes.  AR 60, Ex. A.  However, Mr. Bell also states that starting recently, a very small amount of locatable pumice smaller than 3/4 inches which is extracted from the mine is hauled out to the plant for processing.  Copar says it was forced to do this since in 2002, the Forest Service revoked a previous agreement to allow Copar to use Forest Road 57 to access its Guaje mine, which was the primary source of supply of pumice for "alternative markets."   After Copar lost access to Forest Road 57, those mine reserves were taken out of production and Copar could not meet its production obligations to the alternative market customers.  As a result, Copar used the pumice processed at San Ysidro to serve this market, using El Cajete pumice to replace Guaje Mine pumice and retain its Guaje Mine customers.  <u>See</u> AR 31 at 1.  Plaintiff's position is that because the majority of the pumice produced from El Cajete is still being sold for use in the garment finishing industry, it is not in violation of any federal statute or regulation.  AR 54, AR 73, Ex. 2, ¶ 12.

C.    <u>Letters Sent by the Agency to Copar</u>

The Forest Service sent several letters to Copar prior to issuing the Notice of Noncompliance in December of 2003. The letters reminded Copar that pumice removed from the El Cajete mine must be used in the stonewash laundry industry because that was the only use for which the pumice was classified as locatable. These letters were sent in September 1998, October 2002, March 2003, May 2003 and October 2003 (AR 8, AR 33, AR 42, AR 46 and AR 53, respectively).

In general, the letters demanded production data and verification by Copar concerning the

end use of the mined pumice, which Copar provided.  The earliest letter was sent to Copar on

September 9, 1998 because there was some indication that Copar was selling +3/4" pumice to

supply uses such as paint fillers and fine abrasives -- which required that +3/4" pumice be ground

to a size smaller than 3/4".  AR 8.  The Forest Service reminded Copar in a letter to Ms.

Armstrong at one point, that just because the pumice was deemed "locatable" at the mine site did

not mean that the 3/4+ pumice from El Cajete could be sold for any purpose, and that the sale of

pumice extracted from the El Cajete mine for common variety purposes would "bring into

question the locatability of the +3/4" pumice." AR 8 at 1.

The trigger for the October 15, 2002 letter, which was sent to Kelly Armstrong, Richard

Cook's daughter, was Copar's proposal to start a new mine northeast of El Cajete.  AR 33.  The

Government was concerned because it had received information which indicated that the

stonewash pumice market was continuing to decline.  The Forest Service informed Copar that its

policy was to review pumice classification because of the JNRAA's constraints on mineral mining

in that area, and also because "[t]he classification of a mineral as 'locatable' on an unpatented

mining claim can change due to a change in market conditions."  AR 33 at 1.  The

letter warned Copar that if El Cajete pumice was being used for purposes not requiring its

intrinsic values (i.e., for use in the laundry industry), and could instead be met by common

varieties of pumice, the existing classification of pumice at the El Cajete mine as locatable, "could

be reversed."  The letter acknowledged Copar's loss of production from the "Guaje mine"

because Copar's access to the Forest Road had been closed, and indicated that it was processing

Copar's application to provide access to that mine.

The March 18, 2003 letter from the agency reminded Ms. Armstrong that the Settlement

Agreement for the Brown Placer claims prohibited Copar from disposal of common variety pumice. AR 42. The agency expressed concern that inspections showed that not all of the +3/4" pumice being extracted from the mine was going for "locatable" uses, i.e., for use in the laundry industry. The letter informed Copar that it was not in compliance with 36 CFR § 228.41 because Copar was removing laundry grade pumice from the mine and converting it to other uses. The letter ended with a request for a meeting with Ms. Armstrong.

The May 21, 2003 letter summed up a meeting held earlier in that month between Copar and the Santa Fe National Forest Supervisor. The purpose of that meeting was the Government's reiteration that the only purpose to which pumice at the El Cajete mine could be put was in the stonewash industry, pursuant to case law and administrative decisions. AR 46.

The last letter prior to the December 2003 Notice of Noncompliance was sent on October 31, 2003, which asked Copar for proof of the volume of pumice removed from the Brown Placer claims and verification that all of the pumice produced from the El Cajete mine since the date of the Settlement Agreement has been used only in the stonewash laundry industry. AR 53. The letter again reminded Ms. Armstrong/Copar that pumice which was removed without such verification of end use in the stonewash laundry industry "is common variety pumice and will be treated as such." Ex. 53 at 2.

The agency deemed that Copar failed to provide verifiable proof that all the material it was removing was being sold to the stonewash laundry industry, and subsequently issued the Notice of Noncompliance.

## DISCUSSION

This case is here essentially because the parties have different interpretations of federal

10

regulations regarding what makes pumice "locatable" as an uncommon variety mineral, and therefor extractable under the relevant mining laws.

## I.      Positions of the Parties

Plaintiff contends that the agency used the wrong standard to determine the "locatability" of the pumice.  Copar argues that the deposit and characteristics of the deposit of the mine determines the classification of the mineral, and that commercial fitness for a certain use is distinct from whether a specific use is the chief use of the mineral.  Putting this argument in the context of the pumice at the El Cajete mine, the initial classification of the mine as containing locatable pumice should summarily dispose of the issue, regardless of the eventual uses of the extracted pumice.

Under Copar's reading of the pertinent regulations, all of the pumice it is mining is excluded from 36 C.F.R. § 228.41(c) because as long as the pumice *deposit* can be characterized as "suitable for use" in the laundry industry, the deposit is locatable and of the uncommon variety, regardless of whether all of the pumice ends up being actually used in the laundry industry. Plaintiff takes this position for several reasons: (1) the agency did not impose an end-use requirement on Copar when it initially approved Copar's operations; (2) the agency's position is inconsistent with its own regulations; and (3) the agency's position is contrary to the relevant case law and statutes and contrary to the applicable legal standard under the Administrative Procedures Act.

Defendants' position is that all pumice removed from the El Cajete mine must be used in the stonewash laundry industry ("laundry-grade pumice") because this is the only use for which the pumice is classified as "locatable" under the Mining Law and under 36 CFR § 228.41(c).

Also, the Forest Service contends that locatability of the mineral is not fixed, that classification of

a mineral is subject to change if the regulatory requirements determining locatability are not met,

and that it is the agency's call to make this determination.  The JNRAA prohibits removal of

common variety minerals from the Jemez National Recreation Area.  Thus, the Government

contends that removal of any pumice which does not go to the stonewash industry is a violation of

federal law (the JNRAA), as well as the Settlement Agreement between the parties.  Under its

interpretation of the regulations, the agency sees no distinction between removing common

variety pumice (less then 3/4") – which is not occurring here – as opposed to removing +3/4"

pumice from the mine, taking it off-site for crushing, and selling it for common variety purposes.

In fact, in the Government's view, the latter situation results in the use and destruction of more

surface area than necessary.

## II.   **Legal Standard Under the APA**

The Administrative Procedure Act ("APA"), requires that the court gives deference to the

agency.  St. Mark's Charities Liquidating Trust v. Shalala, 141 F.3d 978, 980 (10th Cir.1998).

Under the APA, a court may set aside the agency's action only if it was "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).  The

party challenging an agency action bears the burden of proving that it was arbitrary and

capricious.  Angel v. Butz, 487 F.2d 260, 263 (10th Cir.1973).  The arbitrary and capricious

standard of review has been equated to the substantial evidence test.  AllCare Home Health, Inc.

v. Shalala, 278 F.3d 1087, 1089 (10th Cir. 2001) (citing Northwest Pipeline Corp. v. Fed. Energy

Regulatory Comm'n, 61 F.3d 1479, 1485 (10th Cir.1995).  Under this standard, the Court must

determine whether the agency considered all relevant factors and whether there has been a clear

error of judgment.  Pennaco Energy, Inc. v. U.S. Dept. of Interior, 377 F.3d 1147, 1157 (10th

Cir. 2004) (citation omitted).  In addition to requiring a reasoned basis for agency action, the

"arbitrary or capricious" standard requires an agency's action to be supported by the facts in the

record.  Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir.1994). Thus,

agency action will be set aside as arbitrary unless it is supported by "substantial evidence" in the

administrative record. Id. "Substantial evidence is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." Doyal v. Barnhart, 331 F.3d 758, 760 (10th

Cir.2003) (internal quotation omitted). "This is something more than a mere scintilla but

something less than the weight of the evidence." Foust v. Lujan, 942 F.2d 712, 714 (10th

Cir.1991) (discussing "substantial evidence" standard). "Evidence is generally substantial under

the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual

conclusion." Hoyl v. Babbitt, 129 F.3d 1377, 1383 (10th Cir.1997).

The standard of review courts must follow is a narrow one, and the Court may not

substitute its judgment for the agency's.  Citizens to Preserve Overton Park v. Volpe, 401 U.S.

402, 416 (1971); see also, Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.

Co., 463 U.S. 29, 43 (U.S.Dist.Col.,1983) (court may not supply a reasoned basis for the

agency's action that the agency itself has not given).

The analysis in this case hinges on a single question: whether the agency's interpretations

of its regulations regarding how an uncommon variety mineral is defined, is entitled to the

deference generally afforded agency decisions.

**III.    Notice of Noncompliance Under the APA and Agency Authority**

Plaintiff contends that the Notice of Noncompliance and administrative decisions

upholding the Notice are contrary to the APA; and that the Forest Service has disregarded applicable law, exceeded its authority and violated property rights guaranteed by federal and state constitutions.  I start first with a review of the pertinent regulations and applicable case law.

A.     <u>Regulations</u>

Copar maintains that Subpart A regulations which pertain to general mining operations, apply to El Cajete pumice, rather than Subpart C regulations which govern the disposal of common variety minerals.  Subpart C regulations would not apply to pumice mined at El Cajete mine if the pumice is excluded by Subpart C regulations.  Subpart C regulations do not expressly include the terms "end-use" or "potential use."  Thus, the first place to start is the plain meaning of the language in the regulations.  <u>See</u>, <u>Ingersoll-Rand Co. v. Mcclendon</u>, 498 U.S. 133, 139 (1990) (traditional principles of statutory interpretation dictate that we first look at the plain meaning of the statutory language).

I find that the word "use" as contained in the Subpart C regulations, reasonably supports Defendants' "end use" position.  For example, 36 CFR § 228.41(d) states that minerals are *not* covered by Subpart C regulations if they are "**used** in manufacturing, industrial processing, or chemical operations for which no other mineral can be substituted due to unique properties giving the particular mineral a distinct and special value. . ." (emphasis added).

Coming at the issue another way, Subpart C regulations also discuss mineral materials which are *included* in that section, and the language strongly suggests actual use as a defining characteristic:

> Mineral materials to which this subpart applies. This subpart applies to mineral materials which consist of petrified wood and common varieties of sand, gravel, stone, pumice, pumicite, cinders, clay, and other similar materials. Such mineral materials include deposits

14

which, although they have economic value, are **used** for agriculture, animal husbandry, building, abrasion, construction, landscaping, and similar uses.

36 CFR § 228.41(c) (emphasis added).

Further, the regulations support the Government's position that the locatability of a mineral is not a fixed characteristic:

A **use** which qualifies a mineral as an uncommon variety under paragraph (d) overrides classification of that mineral as a common variety under paragraph (c) of this section.

§ 228.41(e)(emphasis added).  This language can plausibly be read to mean that how the mineral material is actually put to use – not simply its potential for use – defines a mineral as an uncommon variety mineral.  If a mineral which is initially described as locatable is not being used in a manner which excludes it from Subpart C regulations, then it is fair to say that its use as a common variety mineral renders it subject to those regulations.

The Forest Service determined that Copar was in violation of federal law because it had failed to account for the sale of all the pumice extracted from the El Cajete mine to the stonewash laundry industry.  Plaintiff contends that this position is inconsistent with its own regulations, pointing to two items in particular: the Final Environmental Impact Statement (FEIS), and the agency's response to a public comment issued during the formal public comment period for the FEIS.

Copar contends that the FEIS represents that size alone defines the locatability of a mineral: "The common variety pumice, which is pumice smaller than three-quarters of an inch, would be sorted out and used along with the overburden to backfill the mined area. . . ."  AR 4 at 11.  Plaintiff offers this language to mean that the sole requirement for uncommon variety pumice is a size of *over* three-quarters of an inch, regardless of its use.  Plaintiff also notes that the

15

agency's response to a public comment expressly contradicts its present position.  In response to a

comment inquiring into how the public would be assured that the pumice mined at El Cajete

would be used for common variety purposes, the agency stated:

> It is a misconception that the eventual use of pumice mined on the Jemez National
> Recreation Area is a direct factor in determining whether the pumice is classified as
> "locatable" or "common variety". . . It is not necessary to insure that pumice mined in the
> Jemez National Recreation Aea is marketed for the proper "use," but simply that
> "common variety" pumice does not leave the mine site.

AR 4 at 85.

Plaintiff is correct that the agency's statement in this response is inconsistent with its

position that end use qualifies pumice as locatable.  However, the agency's position is not

inconsistent with its regulations, which suggest that end use or actual use governs the

classification of pumice as an uncommon variety mineral, and  Plaintiff provides no legal rationale

as to why a response to a public comment trumps regulations lawfully promulgated under federal

law.

With regard to the language in the FEIS that Plaintiff interprets as equating locatability

with size alone, Defendants have never discounted size of the mineral as a factor into locatability.

Thus, the FEIS language is consistent with the agency's position.  At the same time the language

in the FEIS regarding size does not effectively eliminate any other requirements – such as use –

included in the Subpart C regulations.

The Classification Report that was completed in May, 1995 on Mr. Cook's Brown Placer

Claims Nos. 9-12 concluded that pumice larger than 3/4" "that is suitable for use in the garment

finishing industry" was "subject to location" at the proposed mine.  AR 4 at 33.  This language is

not particularly conclusive because it does not answer the question whether suitability envisions

an actual or end use of the product.

An agency's decision is entitled to a presumption of regularity.  See, Utah Environmental Congress v. Richmond, 483 F.3d 1127, 1137  C.A.10 (Utah)2007.  Additionally, an agency's interpretation of its own regulations are given great deference, unless those interpretations are "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning."  No deference is due to an agency interpretation which contradicts the regulation's plain language. Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994).  Based on the Court's review of the applicable federal regulations, I find that Defendants' position is not inconsistent with its interpretation of these regulations and should be afforded the requisite deference.

B.     Case Law

Because both parties argue that case law supports its position, I will examine the major cases on which the parties rely.

1.     U.S.A. v. Multiple Use, 120 IBLA 63 (1991 & 1998) (I & II)

These cases involved a challenge by the Forest Service to the validity of two pumice claims in Arizona.  Multiple Use II affirmed Administrative Law Judge ("ALJ") Sweitzer's finding that the pumice on the White Vulcan claim was suitable for stone-washing garments and was therefore locatable, but remanded the case on a discovery issue which concerned the marketability of one of the mining claims.  The appeals decision holds that revenues from sales of pumice or pumice products for common variety uses should not be combined with revenues from sales for uncommon variety uses when ascertaining the economic viability of a mining operation. 120 IBLA at 81.

Plaintiff acknowledges that the posture of these cases is very different from our case because Multiple Use does not address whether end-use or potential marketability defines the

locatability of a mineral, yet reads the case to mean that end use of a mineral is not the sole

determinant of whether a mineral is classified as uncommon or common variety. Copar relies on

particular language in the case in which the Interior Board of Land Appeals ("Board') announced

the test as whether the pumice contained in the deposit holds "a unique property which gives it a

competitive advantage over general run of the mill pumice." 120 IBLA at 77. The Court does not

consider this language to reject Defendants' position that the "competitive advantage" means

actual sale of all the pumice to the laundry industry. In fact, I consider the <u>Multiple Use</u> cases to

be more supportive of Defendants' position, based on some of its Board's statements: "we are

unable to adequately discern the extent of the potential for continued **sales** of stone-washing

pumice from the White Vulcan No. 2 claim. . . ." 120 IBLA 125 (emphasis added). This

language would seem to indicate that end use ("sales" to a certain market) determines whether

pumice is of uncommon variety and is locatable. Further, the language "continued sales" supports

the agency's position that once the pumice is initially classified, its locatability is not fixed, but

remains dependent on those characteristics which render it locatable.

      2.    <u>Mid-Continent Resources, Inc. & Pitkin Iron Corp</u>., 148 IBLA 370 (May 14,

          1999)

    This case was an appeal from a BLM decision which restricted limestone mining to

locatable grade material on mining claims. The case involved three stockpiles of locatable

limestone/calcite minerals, with one of these stockpiles resulting from crushing operations of the

first two stockpiles. The crusher fines from that stockpile were sold for use as fill material in road

construction – a use that is associated with common variety minerals.

    Plaintiff Mid-Continent argued what Copar argues here – that BLM's function is not to

follow the disposition of the entire product to its end use and "discriminate between qualified and

non-qualified sales." 148 IBLA 377.   As illustration, Copar points to the ALJ's discussion in

<u>Mid-Continent</u> of a 1987 letter from BLM to Mid-Continent in which BLM states that "no direct

legal precedent exists on the question of whether or not locatable grade limestone from a valid

claim can be disposed of for common variety purposes." At 373.  148 IBLA 373.  Plaintiff

believes that this language is tantamount to a rejection of the Forest Service's contention in the

present case that sales of pumice extracted from the El Cajete mine must be limited to qualifying

uses.

  Plaintiff's contention overreaches the holding in <u>Mid-Continent</u>.  In that case, the Board

found it unnecessary to reach the merits of other arguments raised by the plaintiff because Mid-

Continent could not begin to show that the crusher fines "can be sold" for a qualifying end use.

148 IBLA 378.  The ALJ noted that only that the issue of whether a mineral is an uncommon

variety stone depends on whether there is a "showing that the stone in fact **can be sold** for a use

that gives the limestone special value." 148 IBLA 377 (emphasis added).  The ALJ held only that

"Appellants may dispose of mineral material from any or all of the stockpiles, provided they can

show . . . that they can market it for qualifying end-uses." 148 IBLA 378.   It is not clear whether

marketability means a potential for marketing, or marketing with actual sales as the objective.

However, the case does contain language which hints that end use is what matters:

 ". . . . BLM can require the claimant to establish that the mineral mined pursuant to an approved

plan of operations is a locatable mineral and that sales **will be** to qualifying markets." 148 IBLA

at 379 (emphasis added).

  Thus, <u>Mid-Continent</u> cannot be read to bolster Plaintiff's arguments.  At best, Plaintiff can

argue that the case did not address the dispositive question head-on in its holding.  What Mid-Continent does provide is ammunition for Defendants' position that the agency's interpretation of its regulations was not arbitrary or capricious.

      3.     Pass Minerals, Inc., 68 IBLA 183 (March 16, 2006)

      Defendants rely on this case as support for its authority to monitor whether a mineral is of common variety, based on its use.  See, 168 IBLA 183 at 191.  Pass Minerals is an appeal from a mineral trespass claim, based on the unauthorized removal of waste rock from public lands and its processing and sale for use as sand and gravel, which are not locatable minerals.  Plaintiff believes this case does not apply to its situation because the claimants in Pass Minerals had not established that the mine contained a valuable mineral deposit.  This is true.  However, Pass Mineral's holding also endorsed the BLM's authority to keep tabs on whether mining extractions conform to applicable federal statutes, such as the Surface Resources Act.  The case also appears to reinforce the agency's argument that the *use* of the mineral determines its locatability, since the case turned on how the extracted sand was used:

> Finally, none of the sand and gravel appellants disposed of was **used** by appellants for prospecting or mining or any purposes reasonably incident to activity authorized under the mining law . . . to the contrary, it was used as . . . road base and as aggregate in other commodities. . . .

168 IBLA at 191 (emphasis added).

      4.     U.S. v. Armstrong, N.M.N.M. 97937 (1999)

      In this administrative proceeding before the Department of the Interior Board of Hearings and Appeals, the Forest Service successfully challenged some of Mr. Cook's (Copar's) Brown

Placer claims.  AR 12.[2]  Judge Heffernan, the ALJ in that case, acknowledged that the Government was not challenging claims 9-12 because the Forest Service  had already conducted mineral examinations and determined that those claims "implicated discoveries that were mineral in character." Judge Heffernan noted that the Cooks (including Ms. Armstrong) had located 23 "placer" mining claims "for the purpose of mining pumice of at least 3/4 inch size, which is utilized in the garment finishing industry."  AR 12 at 1.  The Forest Service challenged the remaining 19 claims on the basis that the pumice on those claims had no value because its quantity was "excessive" for use in the stonewash industry.  The ALJ concluded that these 19 challenged claims were null and void because the Cooks had not shown that a valuable mineral discovery exists, that is, they could not demonstrate that they had a prospective market for more pumice than the deposit that was already located on valid claims 9-12.

Defendants cite to the Armstrong case because it appears to support its position that end use determines the value of the deposit.  Judge Heffernan considered evidence and expert testimony in the context of marketing *for sale* to the laundry industry.  Evidence was presented on the then-current and prospective industry demand for pumice which was decreasing at the time. The laundry industry was starting to use enzymes instead of pumice because of problems with the use of pumice related to disposability and damage to equipment such as washer drums.   Judge Heffernan concluded that the challenged placer claims were not valuable deposits because the Cooks could not show they could be marketed.  In the context of the marketing testimony

---

[2]  The Cooks' case in Federal Claims court differed from this case in that the Federal Claims case was purely a takings claim, resulting in the negotiation of a Settlement Agreement between the Cook family and the government.  The Armstrong case addressed whether the pumice located at the mine was locatable.

presented at that hearing, "marketing" took on implications of actual sale.  Judge  Heffernan also

relied on Multiple Use II in his reasoning:  "The [IBLA] determined in [Multiple Use II] that

pumice which occurs in sizes over 3/4 of an inch, and **which is used** for stonewashing denim

garments, is locatable."  (AR 12 at 3) (emphasis added).

Plaintiff ignores the Armstrong decision in its brief, citing instead to interlocutory orders in

the case that were made concerning the value of the mine.  None of these have any bearing on the

relevant issues in this appeal.  The Cooks' takings case in Federal Claim Court, Cook v. U.S., 42

Fed.Cl. 788, 792-3 (1999), addressed only the issue of compensation for the Cooks' loss of patent

rights.  The Forest Service's 1995 Classification Report, which I have already mentioned, only

noted that the pumice at El Cajete mine was "suitable for use."   The Classification Report does

not answer the question of what happens to the pumice's locatability when some of the pumice

removed is sold for common variety purposes.

The two decisions in the Armstrong case cited by Plaintiff are: U.S. v. Armstrong et al,

NMNM 97937, Dec. 5, 1997; and U.S. v. Armstrong et al., IBLA 98-163, June 18, 1998, which

are both interlocutory orders. The 1998 decision is an appeal of the earlier decision, where the

sole issue was the scope of evidence for discovery, and the limits of the evidence that would be

presented. The Forest Service wanted to present discovery evidence on the claimants' efforts to

show marketability which spanned all the way to the hearing date, but the ALJ decided that a

claimant was required to show marketability only as of the date of withdrawal of the land from

location (that is, issuance of patents), which under the JNRAA was May 1991.  Copar now argues

that the agency cannot revisit the marketability issue on its claims because as of May 1991, the

marketability of claims 9-12 had already been established. This argument is creative, but has no

merit.  Judge Heffernan's order limiting the showing of marketability to May 1991 was decided in the context of admissibility of evidence and the validity of a placed claim.  This ruling is neither dispositive nor relevant to the locatability of the El Cajete pumice which has not been sold to the laundry industry.

In the 1999 <u>Armstrong</u> decision, the ALJ considered actual sale of the pumice from the contested claims to the laundry industry.  So, it is not surprising that Plaintiff does not mention the 1999 <u>Armstrong</u> decision, because the decision runs counter to its arguments presented here.

5.    <u>Quality Earth Minerals</u>, 163 IBLA 160 (2004)

At first blush, this case appears to support Copar's position that once locatable pumice is extracted, Copar has the right to determine how it is used or sold.  Quality Earth Minerals ("QEM") and BLM had entered into a contract for the sale of mineral materials which prohibited any "extraction" of minerals after the contract expired.  During the contract period, QEM had stockpiled the minerals on site, and after the contract had expired, continued to process the undifferentiated material into sand and gravel.  BLM contended QEM was committing trespass, arguing that the continued processing was equivalent to "extraction."  The IBLA agreed with BLM that processing operations on the site after the contract expired would be trespass.  However, the IBLA defined "extraction" as severance from the earth, holding that QEM's processing of mineral material stockpiled on the claim was not trespass under the contract because QEM did not conduct any extraction after the contract expired.  The IBLA further noted that QEM owned the mineral material that it had removed prior to the contract expiration, citing <u>Forbes v. Gracey</u>, 94 U.S. 762 (1876), which holds that minerals are personal property of the miner once extracted.

23

Copar analogizes the holding in <u>Quality Earth</u> to our case to mean that extraction of pumice is not equated with processing of pumice for a particular end use, and that the agency's authority to monitor mineral disposal ends with extraction of the pumice from El Cajete. However, <u>Quality Earth</u> is distinguishable because that case concerns the interpretation of terms in a contract between BLM and Quality Earth Minerals.  The narrow definition of "extraction" in order to determine whether trespass had occurred in that case is not applicable to this case, where the issue concerns whether a certain use affected the mineral's locatability.

Based on the foregoing review of the relevant case law, I conclude that the Forest Service did not disregard federal regulations and applicable case law because the latter reasonably supports the agency's position that all pumice extracted from El Cajete mine must be sold to the stonewash laundry industry to be considered locatable and of uncommon variety.  Thus, the Notice of Noncompliance and administrative decisions upholding the Notice are not contrary to APA standards, because they are neither arbitrary nor capricious.  The agency's action is also supported by substantial evidence in the administrative record.  Copar does not dispute that it does not sell all of the El Cajete pumice to the stonewash laundry industry and that it sells some of the pumice to alternative markets for common variety purposes.  Copar disputes the amount sold for that purpose, but the exact amount is not relevant to the central issue: whether the Forest Service can require an accounting of the end use of all pumice mined from El Cajete, based on its interpretations of federal law.

C.     <u>Whether The Agency Exceeded Its Authority</u>

Copar contends that the Forest Service's requirement of an accounting of sales extends beyond what it is statutorily permitted to do.  Plaintiff recognizes that the agency is authorized to

manage and dispose of surface resources, and to limit use or misuse of surface resources on
unpatented claims, but views the agency's actions as impermissible interference with mining
claims.

Under 36 CFR § 228.4(e)(3), Subpart A, an agency has authority to monitor whether the
mining operator is causing irreparable harm to the mining site surface area.  Section § 228.7 limits
the agency's authority to assure that mining activities are being carried out in accordance with the
Plan of Operations.  Copar argues that the Forest Service's regulatory authority does not reach
post-production disposition of minerals, which is the responsibility of the Secretary of the Interior,
not the United States Forest Service, relying on 36 CFR § 228.1 ("it is not the purpose of these
regulations to provide for the management of mineral resources").

Copar essentially argues for a hands-off relationship between itself and the Forest Service
once pumice at the El Cajete mine was deemed valuable, precluding any inspection or oversight of
mining operations by the agency.  These arguments have no merit because an agency's authority
under § 228.7, which governs inspection and noncompliance, is actually broader than described by
Plaintiff.  Section 228.7 states that: "(a) Forest Officers shall periodically inspect operations to
determine if the operator **is complying with the regulations in this part** and an approved plan
of operations." (emphasis added).  This would include monitoring Copar's mining activities to
make sure that it was not mining common variety pumice, as provided in the Settlement
Agreement, and as prohibited by federal law under the JNRAA.

The Forest Service manual includes provisions which come within this regulatory
authority and which describe the rights of that agency to inquire into the extent and validity of
rights claimed.  These rights do not cease until legal title has passed.  AR 67 (portions cited in

25

Forest Service responsive statement on appeal).[3]  There are no restrictions on when or how often

a mineral examination may be conducted.  See, U.S. v. Russ Knecht, IBLA 78-544 ( (January

1979) (Government retains right to enter unpatented lands at any time without search warrants

"pursuant to its power and obligation to administer the lands according to the terms of the mining

laws").

Therefore, I find that the Forest Service's authority was not limited to monitoring Copar's

activities under the Plan of Operations, but included monitoring Copar's activities to ensure that

Copar was complying with federal law and regulations, demanding an accounting of the sale of

the extracted pumice, and issuing the Notice of Noncompliance.

D.     Whether the Agency Violated Plaintiff's Property Rights

Copar next contends that the agency's efforts to monitor how the extracted pumice from

El Cajete is disposed is a violation of its property rights.  Plaintiff relies on Forbes v. Gracey, 94

U.S. 762 (1876), which holds that minerals are personal property of the miner once extracted.

The land on which the mine stands belongs to the Government because Copar has only an

unpatented claim on the mine, pursuant to the parties' Settlement Agreement which followed Mr.

Cook's takings claim.

Copar argues that once the pumice is removed from El Cajete mine, it becomes its

personal property.  In arriving at that point, Copar makes a critical but erroneous assumption that

it retains the right to extract the pumice in the first place.  The agency maintains that the pumice

_____

[3]  See also AR 30 at 1-2 (meeting notes) stating that the Forest Service has a
"responsibility to monitor the market to ensure there is a stonewash market for the pumice . . . if
there is a market and the production from the site is reasonable . . . then pumice may be removed
as an uncommon variety. . . ."

extracted from El Cajete mine is not locatable if it is sold for common variety purposes, under its interpretation of its regulations.  If this interpretation does not violate APA standards, then Copar has no right to extract the pumice, and the extracted mineral does not become Copar's personal property.  If the pumice does not belong to Copar, then <u>Forbes</u>' holding does not apply.  I have already determined that the agency's interpretation of its regulations as requiring end use to define locatability was not arbitrary or capricious.  Therefore, Copar's right to mine the pumice was in question, and the agency did not violate Plaintiff's property rights.

**IV.     Whether the Notice is an Impermissible Collateral Attach on Earlier Decisions**

Copar argues that Subpart C regulations do not apply to El Cajete pumice because "earlier determinations" have already characterized the El Cajete pumice as a valuable and locatable mineral, and locatable minerals are excluded from Subpart C regulations.  36 CFR § 228.41(d).  These "earlier determinations" refer to the Cooks' takings case, the <u>Armstrong</u> interlocutory decisions, and the Monitoring Plan and Plan of Operations for the El Cajete mine.  I have already determined that these "earlier determinations" are not relevant to the question of whether pumice which is sold for common variety purposes is locatable, regardless of the initial classification of the pumice at the El Cajete mine.

It is undisputed that the pumice at El Cajete mine was initially classified as valuable and locatable.  What Copar disputes is the Forest Service's authority to continue to monitor the pumice extracted from El Cajete for locatability.  However, it is clear the agency has continuing authority to monitor whether mining operations are complying with federal regulations, which includes assuring that a miner is extracting locatable pumice.

Copar contends that the Notice of Noncompliance is an "impermissible modification" of

the Plan of Operations and the Monitoring Plan ("Plans").   However, neither of the Plans

envisioned Plaintiff conducting operations in such a way that would affect the locatability of the

mineral it was initially allowed to mine, and thus did not address such a situation.  The Plan of

Operations does not discuss the material being mined.  It addresses only maintenance and

reclamation to minimize surface disturbance and considered environmental protection measures.

The Monitoring Plan addressed ground water sampling reporting and inspection requirements, but

did not address the disposal of minerals or specific compliance with the regulations governing

mineral disposal.

It may be assumed that a miner is expected to comply with federal regulations, whether or

not such a requirement is expressly included within the Plan of Operations or the Monitoring Plan.

Changes that were made to the Plan of Operations or Monitoring Plan, due to the issuance of

Notice of Noncompliance, were to ensure compliance with Forest Service regulations –

notwithstanding Copar's unsuccessful challenges to the agency's interpretation of those

regulations.  This is evident from an e-mail sent by a geologist regarding the El Cajete mine,

which states that "the mine operation itself is complying with the Plan of Operations and

regulations, but [Copar appears] to be removing pumice and using it for common-variety uses

which, if true, is a violation of the [JNRAA]."  AR 55.

Therefore, any effect the Notice of Noncompliance may have had on the Plans to effect

such compliance does not constitute "impermissible collateral attacks" on either of the Plans.

**V.      Evidence of Irreparable Surface Damage**

Copar contends that the Forest Service never asserted that it was causing "irreparable

damage" to surface resources, and additionally, that there is no basis for the assertion of

irreparable injury.  Copar also claims that the Forest Service's modification of the Plan of Operations did not have a permissible basis under the regulations which discuss reasons for modifying such plans.  There is no merit to any of these arguments.

Federal regulations allow mining operations to continue according to a submitted Plan of Operations unless irreparable damage to surface resources occurs.  36 CFR § 228.4(b).  Also, plans of operation may be modified as needed in order to avoid "irreparable injury, loss or damage to surface resources. . . ."36 CFR § 228.4(e)(1) to (3).  Thus, the agency had a permissible basis under federal regulations to modify the Plans.

Contrary to Plaintiff's contention, the agency did advise Plaintiff that removal of pumice in excess of the stonewash laundry industry was causing irreparable injury to the land:

> "The removal of pumice in excess of the stonewash laundry industry pumice [sic] is unnecessarily causing injury, loss or damage to surface resources by causing surface disturbance exceeding what is necessary to extract stonewash laundry industry pumice."

AR 58 at 1 (Notice of Noncompliance).

Plaintiff argues that the agency had no basis to find there was irreparable injury to surface resource.  Copar focuses on allegedly erroneous assumptions made by the agency based on the production data it provided.  According to the Forest Service's interpretation of this data, the great majority of pumice extracted from El Cajete was not being sold to the stonewash laundry industry.  For example, in 2002, 160,000 cubic yards were sold from El Cajete mine, with only 28,383 cubic yards sold to the stonewash laundry industry.

Copar's mine manager, Richard Bell, contends that the 160,000 cubic yards of pumice given as the production amount was a "misquotation" and was only a maximum rate of production the operation was *capable* of sustaining, and not the actual production.  This figure,

29

Plaintiff argues, did not take into account any of the factors affecting production rate, such as inaccessibility of reserves, shrinkage during transport and waste processing. Nevertheless, Copar does not dispute that a small portion of pumice produced at the mine does *not* get sold to the stonewash laundry industry.

Factual disputes concerning the ratio of what was mined and what was actually sold are not critical to this analysis, as long as Plaintiff was processing *some* of the pumice mined at El Cajete for common variety purposes. Plaintiff concedes that it was processing a small portion of pumice produced at the mine for common variety purposes, but claims that this does not change the locatability of the pumice deposit, because according to Copar's interpretation and case law, the determination of locatability is suitability for use, not actual use. This rationale is faulty because it is premised on a finding that the agency's interpretation of the regulations – that pumice sold for common variety purposes is not locatable – is legally assailable. I have already determined that the agency's interpretation of its regulations is not arbitrary or capricious, and thus, the agency would be within its rights to demand an accounting of the sale of all the pumice extracted from the El Cajete mine.

Copar notes that it has actually opened up fewer acres to mining that is actually allowed under the Plan of Operations. As a result, Copar argues that Defendants' notion that the sale of some pumice to alternative markets is negatively affecting surface resources is "nonsensical." This argument detracts from the central issue. As long as even *some* of the pumice is being sold for common variety purposes, Plaintiff is using (and therefore destroying) more surface resources than would be permitted under federal law. Thus, the agency had reason to believe that irreparable injury was occurring to surface resources, based on the fact that the amount of pumice

extracted from the mine exceeded what was being sold to the stonewash laundry industry.

## CONCLUSION

The Notice of Noncompliance issued by the Forest Service indicated that Copar was not permitted to remove locatable, uncommon variety pumice, and subsequently sell it for use for "common variety" purposes.  The inquiry here is whether the decision to issue the Notice is supported by the substantial evidence test under APA standards.

Based on the Court's review of the administrative record, pleadings by both parties, and arguments by counsel at oral argument, the Court finds and concludes that the agency's decision to issue the Notice of Noncompliance meets the appropriate inquiry.  The Forest Service considered several relevant factors and evidence, including but limited to:  the guidance of pertinent case law; the agency's interpretation of its own regulations which the court finds should be afforded deference in this case; the JNRAA provisions which bar production of common variety pumice from the Jemez Recreational area; the agency's ongoing mandate to review the validity of a claim, the unnecessary destruction of El Cajete surface resources, the disparity between the volume of locatable pumice removed and the actual volume sold to the stonewash industry, the Settlement Agreement wherein Copar agreed to not sell common variety pumice, and Copar's refusal to comply with directives issued by the agency prior to the issuance of the Notice of Noncompliance.  The Court further finds that there is a rational connection between the factors considered by the agency and the decision reached by the agency in issuing the Notice of Noncompliance.

Plaintiff attempts to demonstrate that the agency's decision is contrary to logic by pointing out the impracticality of enforcing the regulations by tracking the retail end use of all the pumice

31

extracted from the mine.  However, the Government points out that regulation is  enforceable

because it extends to the Plaintiff's mines and processing plants, not to subsequent sale in the

retail chain.  The issue, as the Government contends, is not what happens to the pumice after sale

to the stonewash laundry industry, but rather what happens to the pumice at Plaintiff's mine and

processing plants.  Copar is simply required to sell its extracted pumice to the stonewash laundry

industry in order for the pumice to continue to be considered "locatable" – and not recrush the

locatable mineral at its plant and sell it for common variety purposes.

I agree with Defendants that, if either position could be considered implausible, it is

Plaintiff's position.  I also agree that, under the agency's interpretation of its regulations, Copar is

violating not only federal law by extracting locatable pumice and selling it for common variety

purposes, but also violating the spirit and mandate of the Settlement Agreement entered into by

the parties.

Under Plaintiff's view, *all* pumice that is considered "locatable" because of its size and

specific value (in this case, sale the stonewash laundry industry), can be extracted and disposed in

any manner, even if *none* of the pumice actually gets to be used for that specific purpose.  This

position makes no sense because it eviscerates the purpose behind the regulations which define a

mineral as "locatable" in the first place.  Copar states that it is careful to leave common variety

pumice on-site for reclamation purposes, and haul away only the uncommon variety pumice.

Here again, Plaintiff pays empty tribute to the regulations limiting removal of minerals under the

Subpart C regulations.  There is little difference between leaving behind common variety pumice,

and hauling away uncommon variety only to recrush it into common variety pumice and sell it for

common variety uses.

Notwithstanding Plaintiff's different interpretation of the Subpart C regulations, it is the agency's interpretation that is under scrutiny in this case.  For the foregoing reasons, the Court finds that substantial evidence from the record supports the issuance of the Notice of Noncompliance and the agency's decision was not arbitrary or capricious.  Accordingly, the final agency decision is hereby **AFFIRMED**.

      **THEREFORE,**

      **IT IS ORDERED** that Plaintiff's Petition for Review and Reversal of Agency Decision is hereby DENIED, for the reasons set forth in this Memorandum Opinion and Order.  Judgment in favor of Defendants shall issue.

_____
UNITED STATES DISTRICT JUDGE